**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **TODD GREENLEAF,** | : | **Case No. 2:09-CV-192** |
|  | : |  |
| **Plaintiff,** | : |  |
|  | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : |  |
|  | : | **MAGISTRATE JUDGE ABEL** |
| **DTG OPERATIONS, INC.,** | : |  |
|  | : |  |
| **Defendants.** | : |  |

## OPINION AND ORDER

### I. INTRODUCTION

This matter is before the Court on the Motion of Defendant DTG Operations, Inc. for Summary Judgment.  (Dkt. 48.)  Defendant requests summary judgment on all claims against it, the race discrimination, retaliation, and wage discrimination claims of Plaintiff's Second Amended Complaint.  (Dkt 21.)  For the reasons set forth below, Defendant's motion is **GRANTED** in part and **DENIED** in part.

### II. BACKGROUND

#### A. The Parties

Plaintiff, Todd Greenleaf ("Greenleaf"), brings this action against his former employer, Defendant DTG Operations, Inc. ("DTG"), for race discrimination, retaliation, and wage discrimination in violation of state and federal law.  Greenleaf is African-American, a citizen of Ohio, and resides in Franklin County, Ohio.  DTG is a corporation organized under the laws of the State of Oklahoma with its principal place of business in Tulsa, Oklahoma.  DTG conducts business in Franklin County, Ohio.  DTG is a rental car company that operates rental car

facilities under the Dollar Rent A Car ("Dollar") and Thrifty Car Rental ("Thrifty") brands.  In 2003, Dollar and Thrifty were united under a single holding company.

In North America, the company's operational structure consists of three regions (East, West, and Florida), which are broken into eleven areas.  Each region is led by a Regional Vice President, and each area is led by an Area Director ("AD").  General Managers ("GM") manage operations within a city and report to the ADs.[1]  Regional Vice Presidents have the ultimate authority to make decisions regarding particular employees or operations within their regions.  ADs have general authority to make decisions about particular DTG operations within their areas.  DTG has never promoted an African-American to a position higher than GM.

### B. Greenleaf's Employment History

DTG first hired Greenleaf as a Station Manager in Baltimore, Maryland in June 1998.  He had obtained a bachelor's degree and had experience in the car rental sector.  He received a merit-based pay increase in March 1999.  In 2000, Greenleaf participated in DTG's Accelerated Management Program ("AMP").[2]  He was the only African-American that DTG selected for AMP.  Greenleaf alleges that during the program, DTG took him and the participants to Southern Hills Country Club, which did not welcome African-Americans.  The company's senior management made jokes as to whether African-Americans were let into the club.  Once they

---

[1]Prior to 2002, the highest level manager at a location was called the City Manager.  In March 2008, DTG restructured the GM position and removed the City Manager position.

[2]DTG interviewed Greenleaf selected him for the program.  DTG alleges that Jim Duffy was part of the interview team and selected Greenleaf for AMP, but this is not clear from the record before the Court.

arrived, someone told Greenleaf to sit at a table. For the entire event, he sat at a table by himself in the back; he was the only African-American there.

After Greenleaf completed the AMP, he became a City Manager IV in San Francisco at a satellite location for the airport. Greenleaf received a merit increase in March 2000. A few months later, he left San Francisco for Washington, D.C to be a City Manager III at an off-airport location. The circumstances that led to his departure are disputed. Greenleaf alleges that he only left San Francisco because DTG led him to believe that a better opportunity existed in DTG's East Region as GM of the Washington, D.C. operation. DTG alleges that his position in San Francisco was eliminated, and so DTG offered to transfer him to DC. DTG claims that Greenleaf was informed prior to accepting the position that the move would lead to a salary reduction $5,000, but he alleges that DTF initially told him that his pay would be the same as in San Francisco. Greenleaf alleges that there are several white mangers who took similar positions, in conjunction with job grade demotions, who were not asked to take a pay cut.

Greenleaf spent several months preparing the Washington D.C. location to go "on-airport."[3] After he completed the transition, the management position at the location was increased to City Manager V. DTG did not post the position. East Region Vice President Jim Duffy ("Duffy") selected a white GM, Dave Gundel, for the position. As a result, Greenleaf was demoted to station manager. Greenleaf felt that the explanations for selecting Gundel were racially motivated. He contacted George Corneau ("Corneau") and Warren Gross ("Gross") at Human Resources and complained directly to his supervisors. Greenleaf alleges that in

---

[3]"On-airport" means that the operation would operate out of and service an airport. It is considered to be a more favorable position because on-airport locations tend to have higher revenue than off-airport locations.

response, Gross told him: "[H]ere we go again, one of you mother F-ers trying to play the F-ing race card." Corneau said: "[I]t's nothing that you can do about it, brother. . . . These people are running – running the show."

In March 2001, DTG transferred Greenleaf to Columbus, Ohio as a city manager responsible for all operations in the city. He received merit increases in February 2003 and March 2004 and a promotion to GM III in March 2005. In 2006, DTG acquired Thrifty. The size of the Columbus operation increased, and DTG promoted Greenleaf to GM V and raised his salary by 12%. In March 2008, DTG reorganized the field management group. DTG redued Greenleaf's position in Columbus to GM II, but he received a merit increase.

### C. Disciplinary Actions

In April 2001, Greenleaf was disciplined for renting cars to his wife and father at discounted rates. A DTG investigation revealed that he made these rentals over an extended period of time at below-cost rates. Greenleaf argues that DTG attempted to terminate him for this behavior despite the fact that he did not violate any DTG policy. Further, Greenleaf argues that he received permission from his supervisor to charge the rates to his family. DTG argues that it considered terminating him for the offense, but instead issued a written warning and permitted him to retain his job so long as he reimbursed DTG $3,543.14 for the unauthorized rentals. Greenleaf, however, argues that DTG only decided not to terminate him after he presented proof that white employees were renting cars to their families at even lower rates. He insists that DTG never disciplined white employees or terminated them for this behavior.

4

**D. Failure to Promote**

Greenleaf alleges several instances in which DTG overlooked him for promotional opportunities in favor of white candidates.

**Central Area Director Position**: In late 2007, DTG promoted Greenleaf's Area Director, Tom Mierendorf ("Mierendorf"), and the Central AD position became available.  On December 19, 2007, Duffy and Mike Souza ("Souza") interviewed Greenleaf for the Central AD position. To Greenleaf, the interview was a sham.  He observed Souza playing on his Blackberry throughout, and felt that Souza made degrading comments or laughed with Duffy at his interview responses.  In one example, when Greenleaf answered a question as to why he was the best candidate, Souza responded: "Do you know who Barry Sanders is?  Do you know what makes him so great?  He's humble."

A white individual, Danny Florence ("Florence"), received the promotion.  According to Greenleaf, his numbers and performance indicate that Greenleaf was a more qualified candidate than Florence.  Furthermore, he argues, his colleagues believed this as well.

DTG cites other factors to explain why the position went to Florence.  According to Souza and Duffy, Greenleaf's interview was horrible.  They found him to be extremely arrogant, and that he freely insulted bosses and peers.  After completing all of the interviews, Duffy and Souza decided that Florence was more qualified for the position due to his experience at DTG, his management of a larger operation than Greenleaf, and the classes he had taken toward a master's degree.

**Raleigh-Durham General Manager Position**: In 2005, Greenleaf applied for the GM position in Raleigh-Durham.  The position went to a white employee, Brad Kjar ("Kjar").

5

Greenleaf alleges that Kjar was not as qualified for the position because he had lower performance evaluation scores than Greenleaf. Additionally, DTG disciplined him multiple times, including for sexually harassing a female DTG employee. *See Wallace v. DTG Operations, Inc.*, 442 F.3d 1112 (8th Cir. 2006). DTG, however, asserts that Kjar was more qualified for the position based on his experience with the company and his educational background. Whereas Greenleaf had only obtained a bachelor's degree at the time he applied for the position, Kjar had obtained his master's degree in business administration. When the position became available, Kjar's supervisor, John Hoffman ("Hoffman"), insisted that he fill the position. Hoffman interviewed Greenleaf, but ultimately decided that Kjar was more qualified based upon his prior experience and educational attainment. Greenleaf alleges that the qualifying factor was instead, race. He states that a DTG employee, Josh Schwartz ("Schwartz"), told him that he did not receive the position because Hoffman "did not want another black person in Raleigh-Durham." In his deposition, Schwartz states that he never made comments to Greenleaf about the position in Raleigh-Durham.

**Detroit General Manager Position**: In 2007, the Detroit GM position became available. Greenleaf considered applying. Greenleaf told Mierendorf that he was only interested in applying for the position if it was a promotion. Mierendorf told him that it was a lateral move, so Greenleaf indicated that he was not interested. Three months later, a white individual, Shane Penley ("Penley") was hired for the position and it was reclassified as a higher-grade GM position than position that Greenleaf held. With the higher classification, Penley's salary range was higher and he was in a better position to be promoted.

6

## E. Regional Operations Meeting Speech

In September 2007, Greenleaf was extremely frustrated with the unfair treatment he felt he had received at DTG. During DTG's Central Area Regional Operations Meeting, exectuives asked GMs to raise any concerns they had. In response, Greenleaf gave a speech in which he expressed concern that African-American employees had never been promoted above the GM position at DTG despite applications by qualified candidates with track records of success and strong educational backgrounds. When Greenleaf spoke about racial issues and the "glass ceiling" that existed at the company, Duffy became "visibly upset."

At the dinner following the speech, Lynne Pritchard ("Pritchard"), DTG's Vice-President of Human Resources, sat at Greenleaf's table to discuss any concerns with him. Greenleaf openly expressed that he was worried about losing his job after making the speech. Pritchard assured him that the GMs had been invited to raise their concerns, and he would not lose his job for commenting. After the meeting Duffy approached him and said that he would "get him back" for making the speech.

## F. Performance Reviews

Greenleaf's early performance reviews were very good. In his 1998/99 Performance Appraisal, he was rated a "highly effective station manager." In San Francisco, he again received good reviews and achieved performance awards every month. The "highly effective" reviews continued after his transfer to Columbus.

In March 2008, Greenleaf refused to sign his 2007 performance appraisal. After seven years of scoring "highly effective" on his performance reviews, his supervisors rated Greenleaf "effective" on his 2007 review. After receiving the review, Greenleaf sent an email to his

7

supervisor, Florence, regarding "unfair treatment towards me by the company (DTAG)" and contacted Human Resources. A few days later, he spoke with Jennifer Schulz, the Senior Manager of Diversity, and explained the long series of discriminatory that actions he felt DTG had engaged in toward him.

Following-up on these comments, DTG's Employee Relations department investigated his complaints. Greenleaf met with Henrietta Berroteran ("Berroteran"), DTG's Senior Director of Employee Relations, and Mike Snodgrass ("Snodgrass"), DTG's Manager of Employee Relations. After the first meeting, Snodgrass wrote in his notes: "My opinion: Todd does have a legitimate complaint." As a result of this meeting, Berroteran initiated an investigation. She found an error in the performance review, and adjusted Greenleaf's performance appraisal for 2007 upward by one point. As to his other complaints, Berroteran found that nothing was amiss. Greenleaf disagreed with her findings, but did not make any more complaints regarding discrimination.

### G. Greenleaf's Termination

In October 2008, DTG terminated Penley. Per DTG's standard procedure, after his termination, his supervisor, Florence, received access to his computer and e-mail account. While reviewing files on Penley's computer, Florence discovered documents from Greenleaf to Penley that referred to a company called "Greenleaf Luxury Car Rental." The documents described a company that Greenleaf was developing, which was described as "a unique car rental business that will target and market primarily to the African American community." Florence surmised that Greenleaf was developing his own rental car business. Believing this to be a serious issue, he sent the documents to Berroteran.

The documents included: a business plan; brochures; presentations that included images of DTG vehicles and employees; emails between Greenleaf and accountants and a small business advisor; emails referencing a poll of DTG customers; spreadsheets analyzing fleet costs that were based on DTG templates; and a Greenleaf Luxury Car Rental non-disclosure agreement that Greenleaf asked Penley to sign.  Based on these documents alone, Berrotrean believed that Greenleaf was in violation of DTG's code of conduct because he was engaging in a competitive business that would attract DTG customers, and was using DTG equipment and time for this outside business.

The business plan contained marketing research that DTG believed Greenleaf had conducted using DTG vehicles, employees, and computer systems.  The plan also included details of a test that Greenleaf had purportedly run by renting DTG's Lincoln Navigators and Chrysler 300C's to "local" customers only.  The plan stated that "[o]bviously no one knew that there was a test going on except me.  I informed my mangers and rental agents that I wanted these vehicles rented to the locals because they are willing to pay for them."

The proposed business never attracted funding and Greenleaf never established it.  The test with DTG vehicles and materials was a sham.  Greenleaf put together the business plan and other documents, but he never ran a test using DTG vehicles or employees.  Greenleaf got the idea for the business from Mike Reynolds, one of DTG's consultants.  Reynolds advised Greenleaf on how to draft a business plan and connected him to local investors.  He told Greenleaf that any good business plan had to include a market test, so Greenleaf forged the figures.  To Greenleaf, the plan to market luxury automobiles to the local community did not conflict with DTG, as DTG did not rent these vehicles in Columbus.

After reviewing the documents, Berroteran met with Florence, Pritchard, Duffy, Joseph Adamo, the interim Regional Vice President, and in-house counsel.  They decided that Greenleaf's actions warranted termination.   DTG terminated Greenleaf's employment on October 21, 2008 for the "unequivocal and unjustifiable violation of DTG's code of business conduct, misuse of DTG equipment and time, and inappropriate judgment/decision-making." DTG filled his position with a white employee.

### III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The movant therefore has the burden of establishing that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.  But the non-moving party "may not rest merely on allegations or denials in its own pleading."  Fed. R. Civ. P. 56(e)(2); *see also Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994).  The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts."

10

*Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).  When ruling on a motion for summary judgment, a district court is not required to sift through the entire record to drum up facts that might support the nonmoving party's claim.  *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).  Instead, the Court may rely on the evidence called to its attention by the parties.  *Id.*

## IV. LAW AND ANALYSIS

### A. Time Limits

As a threshold matter, some of Plaintiff's allegations are time-barred.  Greenleaf has filed three claims: (1) Race Discrimination; (2) Retaliation; and (3) Violation of the Equal Pay Act and the Ohio Minimum Fair Wage Standard Act.  The standard as to whether the allegations are time-barred for claims (1) and (2) differs from the standard for claim (3).  This Court will first consider whether claims (1) and (2) are time-barred, and then will consider claim (3).

### 1. Race Discrimination and Retaliation

For claims of race discrimination or retaliation under Title VII, a plaintiff must file a charge with a state or local agency within 300 days after the occurrence of the "alleged unlawful employment action."  42 U.S.C. § 2000e-5(e)(1).  For claims under O.R.C Chapter 4112, claims must be filed within six years of the alleged discriminatory or retaliatory action.  *Cosgrove v. Williamsburg of Cincinnati Mgt. Co., Inc.*, 638 N.E.2d 991, 992 (Ohio 1994).  These periods for filing a change may be tolled.  Plaintiff makes three arguments as to why his race discrimination and retaliation claims are not time-barred: (1) the serial continuing violations theory; (2) the systemic continuing violations theory; and (3) the Lilly Ledbetter Fair Pay Act.

The serial continuing violations theory and the systemic continuing violations theory are equitable doctrines that toll the filing period. *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 829 (6th Cir. 2000). In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the Supreme Court limited the use of the serial continuing violations theory when applied to "discrete discriminatory acts. In that case, the Court held that when an employee seeks redress for discrete acts of discrimination under Title VII – such as failure to promote, denial of transfer, or refusal to hire – the continuing violations doctrine may not be used to recover for discrete acts that occurred outside the statutory filing period. *Id.* In other words, "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Morgan,* 536 U.S. at 114. Thus, each discrete act starts a new clock for filing charges alleging that act. *Id.*

The Supreme Court did not disturb the use of continuing violations theory when applied to systemic continuing violations. *Id.*; *see Sharpe v. Cureton*, 319 F.3d 259, 268 (6th Cir. 2003) ("The second category of continuing violations, involving a longstanding and demonstrable policy of discrimination, is not implicated by *Morgan."*). Under this theory, discrete discriminatory acts that are part of "longstanding and demonstrable policy of discrimination" toll the statute of limitations. *Id.* In order to establish a longstanding and demonstrable policy of discrimination, the plaintiff "must demonstrate something more than the existence of discriminatory treatment in his case." *Haithcock v. Frank*, 958 F.2d 671, 679 (6th Cir. 1992). The employer's "standing operating procedure" must include "intentional discrimination against the class of which plaintiff was a member." *Austion v. City of Clarksville*, 244 Fed. Appx. 639, 647 (6th Cir. 2007) (citing *Sharpe*, 319 F.3d at 269). This standard is satisfied when the

12

employer has a "continuing over-arching policy of discrimination." *LRL Properties v. Portage Metro House. Auth.*, 55 F.3d 1097, 1106 (6th Cir. 1995). *See, e.g., Dixon v. Anderson*, 928 F.2d 212, 217 (6th Cir. 1991) (finding an "over-arching policy" of discrimination where that policy appeared plainly in the Ohio Revised Code and administrators openly adhered to the Code); *Alexander v. Local 496, Laborers' Int'l Union*, 177 F.3d 394, 408-09 (6th Cir. 1999) (finding a "longstanding and demonstrable policy" where the union's "working-in-the-calling" rule, which was memorialized in its constitution and bylaws, resulted in "de facto exclusion" of African Americans from union membership); *Jackson v. Quanex Corp.*, 191 F.3d 647, 668 (6th Cir. 1999) (finding "a longstanding and demonstrable policy . . . of tolerating a racially hostile environment in which racial graffiti and slurs and the disparate treatment of African-American workers took place regularly").

Greenleaf has not met the threshold required for systemic continuing violations.  A comparison to *Phillips v. Cohen*, 3 Fed. Appx. 212 (6th Cir. 2001) is useful in this regard.  In *Phillips*, the Sixth Circuit found systemic continuing violations in the employment discrimination context when: (1) plaintiffs' affidavits detailed specific acts of preferential treatment of white employees within the limitations period that prevented the promotion of African-American employees; and (2) plaintiffs made statistically-based allegations of a "glass ceiling."  *Phillips*, 3 Fed. Appx. at 221.  In this case, Greenleaf alleges: (1) specific acts of preferential treatment; and (2) a "glass ceiling" that prevented the promotion of African-Americans above the GM level.  Unlike the plaintiffs in *Phillips*, however, Greenleaf does not support his claim of a "glass ceiling" with statistical evidence detailing relative promotional rates.  Nor does he provide evidence that other African-American employees had experiences

that were similar to his.  Accordingly, Greenleaf is not able to establish a claim of systemic continuing violations.

Finally, Greenleaf argues that his race discrimination and retaliation claims are not time-barred under the Lilly Ledbetter Fair Pay Act of 2009 ("FPA"), Pub. L. No. 111-2 §3, 123 Stat. 5, 5-6.  Congress passed the FPA in response to *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618 (2007), *superceded, in part, by statute,* Fair Pay Act of 2009, Pub. L. No. 111-2, 42 U.S.C. §2000e-5(e)(3).  In that case, the Supreme Court held that "[t]he EEOC charging period is triggered when a discrete unlawful practice takes place.  A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination."  *Ledbetter*, 550 U.S., at 628.  In other words, a claim for wage discrimination had to be filed when the first discriminatory pay decision was made; each new paycheck did not constitute a separate violation.  In response, Congress passed the Lilly Ledbetter Fair Pay Act, which added the following section to Title VII:

> [A]n unlawful employment practice occurs, with respect to discrimination in compensation in violation of this title, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

14

42 U.S.C. 200e(5)(e).  The FPA overturned *Ledbetter* and clearly established that each paycheck resulting in discrimination in compensation was actionable.

Greenleaf argues that the "other practice" language of the FPA saves all of his claims from being time-barred.  Under his interpretation of the amended statute, all acts of discrimination have an effect on compensation, and are thus actionable under the FPA's inclusion of "other practice[s]."  While this language has a generous reach, Greenleaf's argument sweeps too broadly.

The language and purpose of the provision suggest a narrower interpretation: The reach of the Fair Pay Act extends to discriminatory employer practices that result in discrimination in compensation by affecting how an employer calculates wages.  Using the traditional tools of statutory interpretation, this Court "must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous."  *Cowherd v. Million*, 380 F.3d 909, 913 (6th Cir. 2004) (internal citations omitted).  When applied to the FPA, "other practice" must have a meaning that differs from "compensation decision."  To find that "other practice," like "compensation decision," means a determination as to the payment of wages or benefits, would render the "other practice" language superfluous and read the language out of the statute.  Thus, the words "other practice" encompass employment practices that result in discrimination in compensation by affecting how an employer determines compensation or benefits.  These include, but are not limited to, performance-based pay evaluations, business reassignments, and job classifications.

In *Ledbetter*, for example, the plaintiff was paid significantly less than her male colleagues. The difference was the result of poor performance evaluations that the plaintiff received because she was a woman. In essence, the discrimination in pay was the result of a discriminatory employment practice that impacted how the employer determined an employee's pay level. The discriminatory compensation at issue in *Ledbetter* was not simply that the employer paid a female employee less than male employees, but that the employer engaged in discriminatory practices that led to this result.

This situation – other practices that impact how an employer determines compensation – was exactly the activity that Congress intended to include when it passed the Fair Pay Act. During the Senate floor debate, Senator Spector offered an amendment to remove the phrase "or other practices" from the bill. In response, Senator Mikluski, the primary sponsor of the Senate Bill, cited the facts of *Ledbetter* and explained that the language was necessary to "accurately reflect how job discrimination occurs in the workplace." In Ledbetter's situation, and in many others, the discrimination in pay was the result of "other discriminatory actions." Senator Mikluski went on to state that differences in pay could result from a variety of discriminatory decisions, including determinations about how to classify a job, or assignments to particular locations. *See Parra v. Basha's, Inc.*, 536 F.3d 975 (9th Cir. 2008) (Latino workers were paid up to $6,000 less annually than other employees performing the same duties based on their assignment to a store location with a predominately Latino workforce); *Moorehead v. UPS*, 84 Fed. Cl. 745 (Fed. Cl. 2008) (employer claimed that differences in starting salaries for men and women were due to its evaluation system).

What Congress did not intend to include in "other practices," however, were isolated and discrete personnel actions such as promotions or terminations.  155 Cong. Rec. S739-03.  The stated policy goals of the FPA to protect employees from the realities of discrimination in today's workplace support this distinction.  As Justice Ginsburg explained in her *Ledbetter* dissent, "Pay disparities often occur . . . in small increments; cause to suspect that discrimination is at work only develops over time.  Comparative pay information, moreover, is often hidden from the employee's view.  Employers may keep under wraps the pay differentials maintained among supervisors, no less the reasons for those differentials.  Small initial discrepancies may not be seen as meet for a federal case, particularly when the employee, trying to succeed in a nontraditional environment, is averse to making waves."  *Ledbetter*, 550 U.S. at 645 (Ginsburg, J., dissenting).  Only when these small distinctions become magnified over time, when raises are calculated based on the percentage of the current salary, does an employee become aware of the distinction.  *Id.*  When pay discrimination occurs in this manner, each new pay check is a discriminatory act in which one employee is paid less than another.  But these situations differ from discrete, easily identifiable acts, such as terminations or refusals to hire.  When these discrete acts are at issue, an employee is immediately aware of the situation and can promptly file a report.  Accordingly, while the "other practice" language of the Fair Pay Act extends beyond the act of determining pay, it does not encompass the failure to promote, retaliation, or termination claims at issue in this case.  It is possible that decisions surrounding promotion and retaliation could fit within the "other practice" language, but the discrete determinations Greenleaf alleges do not.

Greenleaf is unable to establish that his claims for race discrimination and retaliation are tolled under the serial continuing violations theory or the systemic continuing violations theory, or encompassed by the "other practice" language of the Fair Pay Act.  Any discriminatory acts that occurred outside of the 300-day period are time-barred under Title VII, and any acts that occurred outside of the six-year period are time-barred under the O.R.C. ch. 4112.

Greenleaf filed his action with the EEOC on May 20, 2009.  Thus, the cutoff for Title VII claims is July 25, 2008, and the cutoff for O.R.C. ch. 4112 claims is February 11, 2003.  On claim (1) Greenleaf seeks recovery for four instances of race discrimination: (1) his termination in October of 2008; (2) the failure to promote Greenleaf to Central Area Director in 2008; (3) the failure to promote Greenleaf to Raleigh-Durham General Manager in 2005; and (4) Greenleaf's termination, rehiring, and discipline for rentals to family members in April of 2001.  Greenleaf seeks recovery on claim (2) for retaliation as a result of his 2007 speech at the General Operations Meeting.  When the time limits are applied to claim (1), Greenleaf has two viable claims of race discrimination under both Title VII and O.R.C. ch. 4112: (1) October 2008 termination; and (2) failure to promote to Central Area Director in 2008.  Additionally, his failure to promote to Raleigh-Durham GM claim in 2005 is viable under O.R.C. ch. 4112.  As to claim (2), he has a viable claim for retaliation under Title VII and O.R.C. ch. 4112.  The remainder of Greenleaf's claims for race discrimination and retaliation are time-barred.  Accordingly, summary judgment is **GRANTED** as to Greenleaf's termination, rehiring, and discipline for rentals to family members in April of 2001.

18

## 2. Wage Discrimination

The continuing violations standard for wage discrimination claims is different from the standard for race discrimination and retaliation. Under the Fair Pay Act, each paycheck that is the result of discrimination in compensation constitutes a new violation. Fair Pay Act of 2009, Pub. L. No. 111-2, 42 U.S.C. §2000e-5(e)(3). Ohio's wage discrimination statutes, O.R.C. Chapter 4111, have a one-year statute of limitations. *Thomas v. Ohio Civil Rights Comm'n*, 2006 WL 1697577, at *11 (S.D. Ohio June 20, 2006). Under the continuing violations theory, only the last discriminatory act must fall within the one-year statute of limitations. *Ifeatzka v. Millcraft Paper Co.*, 405 N.E.2d 264, 267 (Ohio 1980). Under Ohio law, each paycheck of unequal pay is a continuing violation, so the plaintiff may seek recovery for each day that the inequality persisted. *Id.*

Greenleaf alleges one instance of wage discrimination: the $5,000 pay cut DTG forced him to take upon his transfer from San Francisco to Washington, D.C in 2000. He alleges that the $5,000 pay cut he received was discriminatory because similarly situated white employees did not receive a pay cut. DTG argues that as this act occurred in 2000, it is outside that statute of limitations. Furthermore, the continuing violations theory does not apply because Greenleaf received subsequent promotions and pay raises, which severed any connection between the 2000 pay cut and any discriminatory act that would be viable under O.R.C. ch. 4111.

In support of this argument, DTG cites *E.E.O.C. v. Penton Indus. Pub. Co., Inc*., 851 F.2d 835, 838 (6th Cir. 1988). In *Penton*, the Sixth Circuit found that the termination of a male employee being paid at a higher rate than a similarly-situated female employee effectively eliminated the discrimination because there was no longer a disparity in wage rates. *Id.* Thus,

under *Penton*, so long as the disparate pay rates between similarly-situated classes of employees presently exist, the discrimination continues. *Id.; see also, Gandy v. Sullivan County, Tenn.*, 24 F.3d 861, 865 (6th Cir. 1994) (finding a continuing violation in a predecessor/successor situation in which the female employee was always paid less than her male predecessor). Unlike in *Penton*, where the discriminatory pay rates ceased, Greenleaf alleges that the discriminatory pay disparity between Greenleaf and similarly situated white employees continued throughout his employment at DTG. As the pay raises he received were based on percentages of his original salary, the raise does not mitigate the discriminatory rate. Any standardized raise he received was based on a salary that was $5,000 lower than a similarly situated white employee would have been paid. As discussed above, this is exactly the kind of situation that Congress intended to protect under the Fair Pay Act. Thus, Greenleaf's claim is not time-barred under either Title VII or Ohio's wage discrimination statutes.

## B. Race Discrimination

### 1. Legal Framework[4]

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "because of . . . race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). In a Title VII case, a plaintiff bears the ultimate burden of persuading the factfinder that the defendant intentionally discriminated against the plaintiff. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Unlawful discrimination does not have to be the only reason for an adverse employment action to violate Title VII, but rather must be an essential component of an

---

[4]In employment discrimination cases, Ohio state courts analyze claims in accordance with federal law. *Barker v. Scovill, Inc.*, 451 N.E.2d 807 (Ohio 1983).

employer's mixed motive. A plaintiff may carry the burden by introducing direct evidence, which shows that in treating a plaintiff adversely the defendant was motivated by discriminatory intent, or by introducing circumstantial evidence that supports an inference of discrimination. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566-67 (6th Cir. 2001).

In order to establish a race discrimination claim in the absence of direct evidence, a plaintiff must make out a prima facie case under the *McDonnell-Douglas* burden-shifting analysis. *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Thus, Greenleaf must show that: (1) he is a member of a protected class; (2) he was terminated; (3) he was qualified for the position; and (4) he was replaced by a person outside a protected class or was treated differently than a similarly-situated, non-protected employee. *Dicarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). After plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for plaintiff's termination. *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 502 (6th Cir. 2007). Once defendant proffers such a reason, the burden shifts back to the plaintiff to show that the reason is merely pretext. *McDonnell-Douglas*, 411 U.S. at 804-05.

### 2. October 2008 Termination

Greenleaf has established a prima facie case for disparate treatment regarding his termination. First, as an African-American, he is a member of a protected class. Second, he was terminated. Third, he was qualified for the position. Fourth, he was replaced by a white employee, or someone outside of the protected class.[5]

---

[5]Defendant argues that Plaintiff cannot establish a prima facie case because he does identify any similarly-situated non-minority employees who were treated more favorably, and thus, does not satisfy the fourth prong. This misstates the law of the Sixth Circuit, which

In response, Defendant argues that Plaintiff was terminated for a valid and legitimate reason:  His involvement with outside business interests.  DTG's Code of Business Conduct limits employee's involvement with outside interests, stating:

> Employees must avoid personal interests that conflict or appear to conflict with the interests of the Company, or that influence or appear to influence an employee's judgment or actions in performing his or her duties as an employee.  All employees must act in the best interests of the Company to the exclusion of personal advantage.

The Code provides guidelines to help employees avoid potential conflicts, including:

> An employee must not . . . do any outside work that may adversely or appear to adversely affect the employee's performance or judgment on the job.  Do not use Company time, facilities, or materials for outside work.

DTG argues that Greenleaf violated this policy in developing business plans for a rental car business that could compete with DTG.  Documents discovered on a DTG computer revealed that Greenleaf had developed a business plan for a rental car company, worked with advertising companies to develop a brochure, and sent the plan to third-parties to secure funding.  The discovered documents also indicated that Greenleaf had polled customers and had used DTG templates to analyze costs for his business plan.  After analyzing these documents, Berroteran, DTG's Senior Director of Employee Relations, determined that Greenleaf was in direct violation of the company's code of conduct because he was engaging in a competitive business utilizing DTG's customers and resources.  He was subsequently terminated.

---

requires the plaintiff show either that he was treated differently or that he was replaced by a person outside the protected class.  *Dicarlo,* 358 F.3d at 414.

Given that Defendant has proffered a legitimate reason for Plaintiff's termination, the burden shifts back to Plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 414.  Plaintiff may demonstrate that Defendant's proffered reason is mere pretext by establishing that it: (1) has no basis in fact; (2) did not actually motivate Plaintiff's termination; or (3) was insufficient to warrant Plaintiff's termination. *Abdulnour*, 502 F.3d at 502 (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds, Geiger v. Tower Automotive,* 579 F.3d 614 (6th Cir. 2009)).

Under the first prong of *Manzer*, a plaintiff must put forth "evidence that the proffered basis for the plaintiff's discharge never happened, *i.e.*, that it is 'factually false.'"  *Manzer*, 29 F.3d at 1084.  Plaintiff asserts that there are issues in dispute surrounding his termination – whether the business he explored would have "competed" with DTG and whether DTG undertook a sufficient investigation – that preclude this Court from imposing summary judgment.

In the Sixth Circuit, the plaintiff is required to show "more than a dispute over the facts upon which the discharge must be based."  *Braithwaite v. The Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001).  Plaintiff must put forth evidence that Defendant did not "honestly believe" in the given reason for Plaintiff's termination.  *Id; see also Majewski v. Automatic Data Processing, Inc*, 274 F.3d 1106, 1117 (6th Cir. 2001) ("As long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect.").  In

23

determining whether Defendant had an "honest belief" in the proffered basis for termination, the Court must look to whether Defendant made a "reasonably informed and considered decision." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).

From the evidence before this Court, it is clear that Defendant "honestly believed" that Plaintiff was conducting outside business in violation of DTG policy.  Plaintiff does not provide evidence that the business plan did not exist or was not made.  He argues that the plan never received funding, so it could not have come to fruition and competed with DTG.  Furthermore, he argues that he received advice about the project from a DTG consultant, so it could not have been in violation of DTG policy.  Nevertheless, Greenleaf used company time and resources to research and develop his business plan.  From the perspective of DTG, this was a clear violation of company policies.  In sum, Plaintiff has not put forth sufficient evidence to show that there is a genuine issue of material fact as to whether Greenleaf was in violation of company policies.

Under *Manzer*'s second prong, Plaintiff can establish pretext by showing that it "was more likely than not" that Defendants terminated Plaintiff based on illegal motivation.  *Manzer*, 29 F.3d at 1084.  In other words, Plaintiff must show "that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup."  *Id.*  Greenleaf argues that Duffy's statement that he would "get" plaintiff for his statements about a "glass ceiling" at DTG suggest that his motivation for terminating Greenleaf was pretextual.  As discussed above, this argument is simply not enough to overcome the discovery of Greenleaf's competing business documents.

Under *Manzer*'s third prong, Plaintiff can establish pretext by showing "that other employees, particularly employees not in the protected class, were not fired even though they

engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer*, 29 F.3d at 1084.

Greenleaf points to three white managers – Kjar, Ross Piere ("Piere"), and Florence – who engaged in misconduct, but were not terminated, to argue that he was treated in a discriminatory manner. In 2000, Piere had inappropriate content on his DTG computer. He received a written warning and counseling. In 2001, Florence made an error that resulted in overpayment of station manager bonuses. When the mistake was discovered, Florence received a written warning. In 2002, a female employee accused Kjar of sexual harassment. The sexual harassment that Kjar was accused of was in direct violation of DTG's Employee Handbook, which states: "Sexual harassment is illegal and not tolerated by DTG under any circumstances." DTG conducted an investigation, and Kjar admitted that he acted inappropriately. He received corrective action for exercising poor judgment in the presence of a female employee.[6]

To DTG, however, a violation of the company's anti-competition policy was more severe. DTG points to two management employees who were engaged in outside business interests and terminated to explain why violations of the conflict policies were fireable offenses while other violations where not. Charlotte Brown-Velazquez, a white female, pressured employees to purchase pre-paid legal services from her. James Couture, a white man, worked on his financial business on his DTG computer during work hours. Both were terminated for working on outside business interests on company time and with company resources.

---

[6]The female employee filed a lawsuit. The 8th Circuit reversed the District Court's grant of summary judgment in the case. The employee subsequently won at trial. *Wallace v. DTG Operations, Inc.*, 563 F.3d 357 (8th Cir. 2009).

Greenleaf's conduct was comparable. If anything, because it could be perceived as directly competing with DTG's business, it was worse.

Greenleaf argues that DTG's enforcement of its Code of Conduct was arbitrary because other employees who engaged in side business on company time were not fired. In support of this position, Greenleaf presents evidence that Duffy engaged in a real estate business on company time. This involved approximately four rental properties that Duffy owned with his wife. While at work, he would occasionally make telephone calls to handle issues that arose with the properties. As DTG argues, however, the scope of this side business pales in comparison to both the effort Greenleaf took to develop his own car rental business and its potential to compete. Nor does it rise to the level of competitive conduct that led to Brown-Velazqeuz's or Couture's termination. As Greenleaf has not shown that DTG's legitimate justification for his termination was pretext, DTG's motion for summary judgment as to Greenleaf's termination is **GRANTED**.

### 3. Failure to Promote to Central Area Director in 2008

Greenleaf alleges discrimination for a failure to promote to Central Area Director in 2008. In order to establish a prima facie claim of discrimination based on failure to promote, a plaintiff:

> must demonstrate that: (1) []he is a member of a protected class; (2) []he applied for and was qualified for a promotion; (3) []he was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied.

*White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 (6th Cir. 2005).  Greenleaf has

satisfied all four prongs.  The first three prongs are not in dispute.  As to the fourth prong, an

individual of similar qualifications, Florence, who was not a member of the protected class,

received the position.  Both Greenleaf and Florence were general managers at DTG, and both

had obtained bachelor's degrees.  While Florence had taken some courses toward a master's

degree, Greenleaf had completed DTG's management training program.  By 2008, Greenleaf had

worked at DTG for 10 years, and Florence for 12 years.  Accordingly, Florence and Greenleaf

had similar educational achievement and work experiences, and thus were similarly situated.

*See McMillan*, 405 F.3d 405, 414 (6th Cir. 2005) ("The plaintiff need not demonstrate an exact

correlation with the employee receiving favorable treatment in order for the two to be considered

similarly situated.")

Having established that Greenleaf can show a prima facie case, the burden shifts to DTG

to proffer a legitimate reason for the result.  DTG argues that Florence received the promotion

instead of Greenleaf because of Duffy's subjective belief that Florence was the better candidate,

Greenleaf's "lousy" interview, and Florence's experience at DTG.  (Duffy Depo. 90-93, 95, 96.).

Greenleaf presents facts, however, that suggest that this justification is merely pretext.

During the interview, Souza said to Greenleaf: "Do you know who Barry Sanders is?  Do you

know what makes him so great?  He's humble?"[7]  The suggestion that humility is an attractive

quality in African-American men harkens back to the racial politics of the Jim Crow era, when

African-Americans who sought upward social mobility were denigrated as "uppity."  *See*, Terry

Smith, *Everyday Indignities: Race, Retaliation, and the Promise of Title VII*, 34 COLUM. HUM

---

[7]Barry Sanders, an African-American, was a NFL running back for the Detroit Lions.

RTS. L. REV. 529 (2003).  Such a racially biased comment can be evidence of pretext.  *See Robertson v. Granite School Dist.*, 951 F.2d 1260, *2 (10th Cir. 1992) (finding that the use of "uppity nigger" could be evidence of pretext); *Rivers-Frison v. Southeast Missouri Community Treatment*, 133 F.3d 616, 621 (8th Cir. 1998) (finding that the use of "uppity niggers" and the small number of African-American employees was evidence of pretext).  The racially charged statement of Souza, a decisionmaker for the promotion, presents a genuine issue of material fact as to whether DTG's non-discriminatory justification for refusing to promote Greenleaf is a pretext for discrimination.  Accordingly, this Court finds that Greenleaf has offered sufficient evidence of the prima facie case and pretext to defeat summary judgment.  Defendant's Motion as to Greenleaf's failure to promote to the Central Area Director postion is **DENIED**.

### 4. Failure to Promote to Raleigh-Durham GM in 2005

Greenleaf alleges discrimination for a failure to promote to the Raleigh-Durham GM position in 2005.  In order to establish a prima facie claim of discrimination based on failure to promote, a plaintiff:

> must demonstrate that: (1) []he is a member of a protected class; (2) []he applied for and was qualified for a promotion; (3) []he was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied.

*White,* 429 F.3d at 240.  Greenleaf has satisfied all four prongs.  The first three prongs are not in dispute.  As to the fourth prong, an individual of similar qualifications, Brad Kjar, who was not a member of the protected class, received the position.  Kjar and Greenleaf are similarly situated.  They completed the Accelerated Management Program together, and had similar work

experiences managing airport and non-airport locations.  Kjar, however, had obtained a Master's Degree and was managing a larger fleet than Greenleaf.  Nevertheless, Kjar's performance and peer evaluation scores were lower than Greenleaf's in two of the three years before the position became open.  Both candidates had positive and negative attributes, and when balanced with their experiences at DTG and their levels of educational attainment, they are similarly situated.

As Greenleaf has shown a prima facie case, the burden shifts to DTG to proffer a legitimate reason for the result.  DTG argues that Kjar's supervisor, John Hoffman, requested that Kjar fill the position because he was familiar with his work.  Hoffman interviewed Greenleaf, but determined that Kjar was more qualified due to their personal relationship.

Greenleaf argues that this is not a legitimate reason and is merely pretext.  In his deposition, Greenleaf states Schwartz informed him that he did not receive the position because Hoffman "did not want another black person in Raleigh[-]Durham."  In Schwartz's deposition, however, he states that he had no conversations with Greenleaf about Klar's promotion.  Additionally, the evidence shows that Kjar did not receive the position through the formal interview process.   Although Kjar did not apply for the position,  Hoffman pressured him into accepting it.  Taking all inferences in favor the Plaintiff, this informal hiring, which occurred outside of the standard interview process, combined with the statement Hoffman allegedly made to Schwartz, creates a genuine issue of material fact as to whether DTG discriminated against Greenleaf.  Accordingly, summary judgment as to Greenleaf's failure to promote to the Raleigh-Durham GM position is **DENIED**.

### C. Retaliation

### 1. Legal Framework

Title VII of the Civil Rights Act of 1964 forbids an employer from retaliating against an employee  because of the employee's opposition to "any practice made an unlawful practice" by Title VII, of the employee's participation in "an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).  In order to state a prima facie case of retaliation, a plaintiff must establish that: (1) he engaged in a protected activity; (2) his employer know of the exercise of the protected right; (3) an adverse employment action was subsequently taken against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.  *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 995-96 (6th Cir. 2009). If the employee presents sufficient evidence to make out a prima facie case, the burden shifts to the employer to set forth a legitimate, non-discriminatory reason for the adverse action.  If the employer makes this showing, then the burden shifts back to the plaintiff to produce evidence of pretext.  *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008).

## 2. Retaliation for 2007 Speech

Greenleaf alleges that he suffered retaliation for his speech at the 2007 Operations Meeting about DTG's "glass ceiling," in which he highlighted that DTG has never promoted an African-American above the GM position in its 40 years of existence, constituted a protected activity.  He alleges three separate incidents of retaliation: (1) Central Area Director promotion; (2) 2007 performance review; and (3) termination.  It is undisputed that Greenleaf's speech was a protected activity.  Thus, prong one is satisfied.  DTG argues that Greenleaf cannot establish the remaining three prongs.

The second prong requires that an employer know of the exercise of the protected right. The evidence clearly establishes that DTG knew about the exercise of the protected right.

Greenleaf's supervisors, including Duffy, Souza, and Mierendorf, were present when he gave the speech.  In their depositions, Duffy and Mierendorf stated that they were aware that the speech was intended to raise issues of racial equality.  After the speech itself, DTG's Vice President of Human Resources, Lynne Pritchard, came over to sit with Greenleaf to discuss his concerns.  The deposition testimony of Duffy and Mierendorf, as well as the immediate action of Pritchard, indicate that DTG knew about Greenleaf's exercise of his protected right.

The third prong requires that the employer subsequently take an adverse employment action against the plaintiff.  In this case, Greenleaf suffered three subsequent adverse employment actions: (1) failure to promote to Central Area Director; (2) 2007 performance review; and (3) termination.

The fourth prong requires that a causal connection exist between the protected activity and the adverse employment actions.  In order to establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that his protected activity was the likely reason for the adverse action.  *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007).  Temporal proximity is insufficient in and of itself to establish a causal connection, but "a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection."  *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006).  As the first three prongs are established for each alleged adverse action, the Court will examine the causal connection between each adverse action and the speech in turn.  First, in December 2007, three months after the speech, Greenleaf was not promoted to the Central Area Director Position.  This temporal proximity, combined with Duffy's conduct toward Greenleaf, is sufficient to prove a causal connection.  After Greenleaf's speech, Duffy

approached him and said that he would get him "back."  This threatening statement is clearly enough to show a causal connection.  Thus all four prongs are satisfied and Greenleaf has proven a prima facie case.

The burden now shifts to DTG to give a legitimate reason for the failure to promote.  As discussed above, DTG's justification is merely pretext.  Duffy was one of two decision-makers for the CAD position.  His role in the promotion, combined with his statement to Greenleaf, creates a genuine issue of material fact.  Accordingly, summary judgment is **DENIED** as to Greenleaf's claim that failure to promote to CAD was retaliation.

Second, the 2007 performance review was completed by Mierendorf and occurred in March 2008, six months after the speech.  This six month lapse establishes temporal proximity.  *See Nguyen v. City of Cleveland*, 229 F.3d 559, 566-67 (6th Cir. 2000).  As to evidence of retaliatory conduct, Greenleaf argues that circumstantial evidence shows that the negative review was retaliatory in nature.  In his deposition, Mierendorf stated that he told Greenleaf that he was "disappointed that [Greenleaf] didn't come to me and talk to me" about his concerns, and that he found the "time and place" of his remarks "questionable."  Viewed in a light most favorable to the plaintiff, there is a genuine issue of material fact as to whether this disappointment led to retaliatory action.  Accordingly, a causal connection is established and Greenleaf has made out a prima facie case.

The burden now shifts to DTG to give a legitimate reason for the negative review.  After Greenleaf complained about the review, DTG began an investigation.  According to DTG, the investigation revealed that Mierendorf had inadvertently left a score out of Greenleaf's and two other GMs' performance reviews.  DTG subsequently corrected the review.  Based on the fact

32

that the correction only occurred after Greenleaf complained to Human Resources about a long history of discriminatory treatment, there is a genuine issue of material fact as to whether DTG was trying to coverup the performance review in order to avert litigation or avoid future complaints.  Accordingly, DTG has not met its burden of showing a legitimate reason for the negative review and summary judgement is **DENIED** as to Greenleaf's claim that his negative performance review was retaliation.

Third, as discussed above, DTG had a legitimate, non-pretextual reason for terminating Greenleaf's employment.  Even if Greenleaf could establish a causal connection between the speech and the termination, this claim would fail.  Accordingly, summary judgment is **GRANTED** as to Greenleaf's claim that his termination was retaliation.

### D. Wage Discrimination

### 1. Legal Framework

The standard for evaluating a claim for wage discrimination is the same under the Equal Pay Act as under the Ohio Minimum Fair Wage Standard Act, regardless of whether the claim is based on race, sex, or age.  *Dumas v. SBC Global Serv.*, 2008 WL 2497473, at *4 (N.D. Ohio June 18, 2008).  In order to establish a prima facie case of wage discrimination under the Equal Pay Act, and thus under the Ohio law, a plaintiff must prove: (1) an employer; (2) pays or paid different wages; (3) to an employee of a different sex or race; (4) in an establishment; (5) when they are performing equal work on jobs; (6) which require equal skill, effort, and responsibility; (7) under similar conditions.  *Hollowell v. Society Bank & Trust*, 605 N.E.2d 954, 959 (Ohio App. 6th 1992) (citing 29 U.S.C. § 206(b)).  Once an prima facie case is established, the burden shifts to the employer to prove one of four affirmative defenses outlined in the statute by a

preponderance of the evidence.  *Balmer v. HCA, Inc.*, 423 F.3d 606, 612-13 (6th Cir. 2005).  The four affirmative defenses are: (1) a seniority system; (2) a merit system; (3) a system that measures earnings by quantity or quality of production; or (4) any factor other than race, color, religion, sex, age, national origin, or ancestry.  O.R.C. § 4111.17(B)(1-4).

### 2. Pay Cut in 2000

Greenleaf alleges that he received a discriminatory pay cut of $5000 in 2000 when he was transferred from San Francisco to Washington, D.C.  DTG transferred similarly situated white employees to different locations and did not force them to take pay cuts.  DTG claims that the pay reduction was the result of zone differentials.  The company assigns its various locations different salary "zones" based on geographical salary surveys, and all cities in the same zone have the same salary structure.  When Greenleaf transferred, his pay grade changed from "17B" to "16Y," his position changed from GM IV to GM III, and his salary was reduced by 11.6%.  This adjustment, DTG argues, is standard company policy.  DTG presents no evidence as to the scope of its nationwide zones and their relative pay grades, so these numbers are essentially meaningless.

Nevertheless, Greenleaf cannot establish a prima facie case of wage discrimination; he cannot show that there are white employees who were transferred across zones who did not receive pay cuts.  In his deposition, Greenleaf identifies five individuals who did not take pay cuts upon their transfer east: Andrew [no last name], John Schwartz, Dave Gundel, Carol McNeil, and Gary [no last name].  But he only is able to document the relative pay rates of one of these individuals, Gundel.  Gundel was transferred from West to East, like Greenleaf, and promoted from City Manger to III to City Manager IV, unlike Greenleaf, so the comparison is

inapposite.  Even assuming these other allegations are true, without pay records it is impossible

to determine whether white employees were paid higher rates for equal work.  Accordingly,

Greenleaf cannot make out a prima facie case of wage discrimination.  *See Balmer v. HCA, Inc.*,

423 F.3d 606, 611-12 (6th Cir. 2005) (finding a prima facie case of wage discrimination when

plaintiff presented evidence comparing the relative salaries of similarly-situated male and female

employees); *Hollowell*, 605 N.E.2d at 959 (finding that plaintiff who did not have personal

knowledge of other employee's employment file, including performance evaluations, job

description, responsibilities, pay records could not establish that he was paid less than similarly-

situated employees).  Thus summary judgment is **GRANTED** as to Greenleaf's claim for wage

discrimination**.**

### V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED** in

part and **DENIED** in part.  The Motion is **DENIED** with respect to Plaintiff's race

discrimination claims of failure to promote to Central Area Director and Raleigh-Durham

General Manager, and Plaintiff's retaliation claims as to failure to promote to Central Area

Director and the negative performance review.  The Motion is **GRANTED** with respect to

Plaintiff's race discrimination claims of termination in 2008 and discipline for car rentals in

2001, and Plaintiff's wage discrimination claim.

**IT IS SO ORDERED.**

      **s/Algenon L. Marbley**
    **ALGENON L. MARBLEY**
    **UNITED STATES DISTRICT COURT**

**Dated: March 11, 2011**

35